**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ISSA BISHARAT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF NILES, a municipal corporation, | ) | No. 10 C 00594 |
| The NILES POLICE DEPARTMENT, NILES | ) | |
| Chief of Police DEAN STRZELECKI, Star # 1, | ) | Judge John J. Tharp, Jr. |
| Niles Police Officers DENNIS MCENERNEY, | ) | |
| Star # 5, ANTHONY MUSCOLINO, | ) | |
| Star # 173, NENOUS ESHA, and | ) | |
| SARGON HINAWER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a dispute over the ownership of a 2005 H2 Hummer. Plaintiff Issa Bisharat alleges that defendants Nenous Esha and Sargon Hinawer sold the Hummer to him and then stole it back from him. The dispute is in federal court because the plaintiff has alleged that three police officers from the Village of Niles violated his constitutional rights by conspiring with Esha and Hinawer to deprive him of the vehicle by failing to properly investigate the plaintiff's allegations. A default judgment has already been entered against Esha and Hinawer. Before the Court now is a motion for summary judgment filed by the Niles defendants. For the reasons explained below, their motion is granted in its entirety.

## I.    Background

### A.  Factual Background[1]

The facts relating to the dispute over ownership of the Hummer are in dispute—and that is a state of affairs that serves to illustrate how baseless are the plaintiff's claims. The essence of the plaintiff's claim is that the Niles police inappropriately classified his dispute with defendants Hinawer and Esha as involving a stolen vehicle, but as the following recitation should illustrate, one can hardly blame the officer who responded to a 911 call reporting a stolen vehicle for being unable immediately to sort through the conflicting claims of the antagonists in this drama.

The story begins in early 2009, when, Bisharat claims, he agreed to purchase a 2005 H2 Hummer that was owned by defendant Sargon Hinawer but operated and driven by defendant Nenous Esha. Bisharat claims that he was to pay Hinawer $12,000 plus the approximately $7,300 that Hinawer owed to Chase Bank on a loan secured by the car. Bisharat and Hinawer signed an agreement (the "Bill of Sale") on February 6, 2009, at the Baghdad Grocery Store in Niles (where Esha worked), reflecting a total price for the vehicle of $19,308. Bisharat claims that he gave Hinawer $12,000 in cash, but did not obtain a receipt; he has a canceled check (in the amount of $7,328) to show for the payment to Chase Bank. At the time of the agreement, either Hinawer or Esha gave a set of keys to the Hummer to Bisharat. Bisharat claims that they agreed that Hinawer would keep the car itself until Bisharat received the title from the bank.

Hinawer admitted in his deposition that he signed the Bill of Sale.[2] He did so, he said, as a favor to Esha, who really owned the car, and he denied that Bisharat paid him $12,000 in cash

---

[1] These facts are taken from the parties' Local Rule 56.1(a) & (b) statements of material fact (referred to herein as "Def.'s 56.1" (Dkt. 94), "Pl.'s 56.1" (Dkt. 99), and "Pl.'s 56.1 Resp." (Dkt. 99)) and exhibits.

for the car. For his part, however, Esha denied that he had ever sold the Hummer to Bisharat (the summary judgment record does not reflect what Esha said about the Bill of Sale). Esha claimed that while he was doing a remodeling project at Bisharat's bar, he told Bisharat that he wanted to sell his car to CarMax. He testified that Bisharat offered to pay the amount that Esha still owed on the vehicle as a favor, and was going to allow Esha to pay him back bit by bit; the two went to Chase Bank, where Bisharat paid off the approximately $7,300. Bisharat denies that he gave Esha a loan. Sometime later, Esha came to Bisharat's store, Manny's Food & Liquor, and gave Bisharat three $1,000 post-dated checks (presumably, in partial repayment for the purported loan). Bisharat refused to keep them.

Bisharat maintains that title to the vehicle was sent to his business address in Hinawer's name and that, after receiving the title, he called Hinawer to arrange to pick up the vehicle. Hinawer, he alleges, was uncooperative, telling Bisharat that he would meet him to sign the title but repeatedly failed to show up and ultimately stopped taking Bisharat's calls. Maintaining that he was the rightful owner of the Hummer, Bisharat arranged for D&D Towing to tow the vehicle from the Baghdad Grocery Store in Niles for $200 on May 11, 2009.[3] Upon discovering that the Hummer was missing, Esha called Hinawer, who went to the store to make a report about the stolen car. Esha called 911.

Officer Anthony Muscolino, a police officer for the Village of Niles, was dispatched to the store to respond to Esha's 911 call concerning a stolen vehicle. Esha told Muscolino that the

---

[2] Although defendants Hinawer and Esha were served with process but never appeared in the case, both sat for depositons—though Hinawer did so only after he was found to be in contempt of court for failure to comply with the subpoena that was served upon him.

[3] The record provides no explanation for why Bisharat paid $200 to have the car towed if, as he claims, he was in possession of a set of keys.

Hummer had been taken from the store; he said that someone[4] had loaned him $7,000 to pay off the vehicle and that he was trying to repay the money.[5] He also said that he had given the person a set of keys in the transaction. Esha wanted to report the vehicle as stolen, but Muscolino ran the license plate and VIN number through the LEADS system and learned that the registered titled owner was Hinawer. Hinawer was also at the store, though the parties dispute whether he arrived before or after the police. Adding to the confusion, Muscolino observed Hinawer and Esha having a heated discussion in Assyrian, which Muscolino did not understand. Muscolino asked Hinawer whether he wanted Bisharat arrested and whether he wanted to sign a criminal complaint and would testify in court against Bisharat; Hinawer was undecided. Neither Hinawer nor Esha signed a criminal complaint.

To Muscolino's knowledge, he had neither seen nor met Esha before that day, nor had he been to the store.[6] Esha had similarly never seen Muscolino, nor does he have any relatives at the

---

[4] Esha apparently meant Bisharat, though it appears that he did not give Bisharat's name to Muscolino during this particular conversation. Esha identified Bisharat to the police as the party that he and Hinawer believed had taken the Hummer the following day when he visited the police station.

[5] Bisharat disputes these facts "insomuch as [they] infer[] the existence of a loan." Pl.'s 56.1 Resp. ¶ III.B.5. The Court must draw all reasonable inferences in the plaintiff's favor; accordingly, it does not read these facts to establish a loan, only that Muscolino testified in his deposition that Esha relayed this information to him.

[6] Bisharat attempts unsuccessfully to dispute Muscolino's claim that he did not know Esha by citing Esha's deposition testimony in which he states, "Because after I called 911, I went [to the Niles Police Department] after one day maybe, and I told them about the car. So they know me, all of them. I bring the car back to them." Pl.'s 56.1 Resp. ¶ III.F.11 (citing Def.'s Ex. 6, at 84). This broad, conclusory assertion that "all" of the people at the Department knew him lacks the specificity required to establish a dispute over whether Muscolino had seen or met Esha before May 11, particularly when Esha testified more specifically that he did not know Muscolino. Esha Dep. 68, Def.'s 56.1 Ex. 6, Dkt. 94-6. Esha's visit to the Niles Police Department, moreover, occurred the day *after* the 911 call to which Muscolino responded and therefore cannot be relied upon to establish a fact dispute over whether Muscolino knew Esha or had been to the store *before* May 11. Finally, Bisharat's additional citation to his own claim that

Niles Police Department. Hinawer also had neither seen nor heard of Muscolino before that date. Hinawer could not remember what Muscolino asked him at the store.

That evening, Muscolino spoke to Bisharat on the phone[7] and asked him if he had possession of the vehicle; Bisharat responded that he did. Muscolino and Bisharat's account of this phone conversation differ, though both agree that Muscolino wanted Bisharat to bring the vehicle back to the store or to the police department. According to Bisharat, Muscolino told Bisharat that "this is a felony" and that he would be arrested if he did not return the car; he claims that Muscolino asked for his location so that he could arrest him. Bisharat also claims that Muscolino referred to the Bill of Sale on the phone, stating that it was not legal if it was not notarized, but Muscolino denies having said this and maintains that he was never given the Bill of Sale.

According to Muscolino, Bisharat became belligerent on the phone and did not want to bring the car back. Muscolino testified that he told Bisharat that the matter might be entered as a stolen vehicle and that Bisharat could be arrested if he were caught driving the vehicle. Muscolino cannot recall Bisharat's words, but testified that Bisharat told him that he had entered into some sort of agreement with Hinawer and Esha regarding the vehicle and that he had loaned them money; he does not recall Bisharat saying that he owned the vehicle or had a Bill of Sale.

Hinawer said he had a cousin on the Niles police force is unrelated to the defendant's assertions that Muscolino did not know Esha.

[7] At this point, Muscolino did not have Bisharat's name and the record is not clear as to how this call was initiated. Bisharat testified that he received a call on his cell phone from someone who identified himself as Muscolino. Muscolino describes a somewhat more confused situation in which Esha handed him a phone at the store with a call already initiated, which might or might not have been the point at which Muscolino actually spoke with Bisharat, who at that point Esha and Hinawer had identified to Muscolino only as "Isaac," the person who was involved in the purported loan for the vehicle. The parties agree that a call took place between Bisharat and Muscolino that day, so this particular detail is immaterial.

Muscolino claims that Bisharat said he had a person named Ahmed get the car; Muscolino believes he tried unsuccessfully to contact Ahmed.[8] Bisharat would not give his full name, and when Muscolino asked for his address, he said something to the effect of "come find me."

The next day, May 12, 2009, Esha went to the Niles Police Station and gave Bisharat's name and address to Officer Muscolino. Two days later, Esha went to Bisharat's store, Manny's Food & Liquor, found the Hummer parked there, and drove away in it. From the back window of the store, Bisharat saw him drive it away. To Bisharat's knowledge, no one from the Village of Niles or the Village of Niles Police Department ever took, seized, or impounded the vehicle for any reason.

Muscolino filled out an "Incident Report" that indicated that the victim and complaining witness (Hinawer, as the registered owner) and Esha had been loaned money by "Suspect #2" and that Suspect #2 was given a set of keys to the vehicle; Esha noticed the vehicle missing and was advised by Suspect #2 that it had been taken by another person ("Suspect #1") and would be returned once the loan was paid. The incident report also described a call during which Muscolino advised Suspect #2 that a report would be filed for a stolen vehicle if it was not returned immediately. Muscolino indeed filed the report initially classified as pertaining to a stolen vehicle. He then passed it on to be reviewed and forwarded to the Investigations Bureau for followup.

On May 18 and 19, 2009, Bisharat called the Niles Police department requesting a copy of the police report; he was told that it was not yet finished and was referred to Division

---

[8] Bisharat attempts to dispute this by citing his own testimony in which he states that he had D&D Towing repossess the car. The distinction is immaterial; the defendants do not contest that Bisharat actually had D&D Towing tow the car.

Commander Dennis McEnerney. On May 20, 2009, McEnerney told him that the report was not finished and that Bisharat would have to subpoena it. During the call with McEnerney, Bisharat was irritated with the officer who had handled the case and upset that a stolen vehicle report had been made. He told McEnerney that he did not steal the car, that the stolen auto report was an effort to hurt him, and that Muscolino was related to Hinawer. McEnerney offered to help Bisharat resolve the dispute about his vehicle by talking to Hinawer, but as McEnerney describes it, Bisharat was focused on Muscolino, not money. McEnerney advised Bisharat that he would have to go to the Niles Police Station and talk to a supervisor if he wanted to file a grievance or complaint against an officer. Bisharat reiterated his belief that Muscolino was related to Hinawer and that there was a conspiracy to keep Bisharat from obtaining the vehicle or money. McEnerney suggested that Bisharat hire an attorney and file a civil action if he wanted money or the vehicle, also noting that a lawyer would subpoena the stolen vehicle report, though Bisharat does not remember McEnerney so advising him. Bisharat eventually obtained the report via a Freedom of Information Act request.

Bisharat also spoke with Niles Chief of Police Dean Strzelecki about the stolen vehicle report. On May 22, Strzelecki told Bisharat that he would look into it and that he should be able to get it; at that point, Strzelecki did not think there was going to be a problem giving him the report. Strzelecki went to Commander McEnerney, who told him that because potential offenders were listed on the report, Bisharat would have to obtain the report via a subpoena or a Freedom of Information Act request. Strzelecki and Bisharat spoke again, and Strzelecki apologized and explained that Bisharat would have to subpoena it.

McEnerney eventually reclassified the police report from a stolen vehicle matter to a civil matter. McEnerney has the discretion to change or reclassify reports, although there is no specific department procedure or rule that allows such a change to be made; he makes a decision based on whether a matter will be something that a state's attorney would prosecute or whether it is civil in nature. McEnerney found the matter civil in nature because of several factors: Esha was attempting to pay Bisharat for the car in partial payments, the payoff to Chase Bank, and the set of keys in Bisharat's possession. Muscolino was not consulted and did not know why the report was reclassified, and Strzelecki does not know when the reclassification took place, but a police report dated May 14, 2009, shows the matter as reclassified. On the original report, the words "stolen auto" in the "Incident" block were whited out and replaced with "dispute-civil."

On July 22, 2009, Bisharat filed a complaint against Muscolino with the Niles Police Department. Strzelecki told McEnerney to investigate the complaint. McEnerney conducted an informal investigation and supplied Strzelecki with a report, dated August 5, 2009, that explained that the investigation revealed no wrongdoing by Muscolino.[9] McEnerney did not respond to Bisharat in writing.

## B. Procedural Background

On January 28, 2010, Bisharat filed this case against Hinawer, Esha, Muscalino, McEnerney, Strzelecki, and the Village of Niles, among others. Bisharat included sixteen claims arising from the dispute about a single car. Against Esha and Hinawer, he included claims for

---

[9] The parties dispute which exhibit in the record is the actual letter. *Compare* Def.'s 56.1 ¶ III.D.7 (citing McEnerney Dep. Ex. A, Def.'s 56.1 Ex. 4, Dkt. 94-4) *with* Pl.'s 56.1 Resp. ¶ III.D.7 (citing McEnerney Dep. Ex. B, Def.'s 56.1 Ex. 4, Dkt. 94-4). The difference is immaterial at this juncture, as both versions of the letter come to the conclusion that Muscolino did not engage in any wrongdoing, and neither party disputes that the letter was written or that it came to this conclusion.

breach of contract (Counts I and II), breach of the covenant of good faith and fair dealing (Count III), conversion (Counts IV and V), and replevin (Count VI). Against Muscalino, McEnerney, Strzelecki, and the Village of Niles (collectively, the "Village of Niles defendants"), he included § 1983 claims for conspiracy to deprive him of property in violation of the Fourteenth Amendment (Counts VII and VIII), deprivation and continued deprivation of property in violation of the Fourteenth Amendment (Counts IX and X), failure to investigate (Count XI), and state law claims for civil conspiracy (Count XII), tortious interference with contract (Count XIII), intentional infliction of emotional distress (Count XIV), and supervisory and indemnification claims against the Village (Counts XV and XVI). Federal jurisdiction is appropriate under 28 U.S.C. § 1331, in light of the § 1983 claims, and supplemental jurisdiction over the other claims is appropriate under 28 U.S.C. § 1367(a).

By the fall of 2010, while this case was still before Judge Shadur, several defendants not named above had been dismissed from the suit, and Hinawer and Esha had defaulted. Judge Shadur issued an order of default in replevin against them on June 9, 2010, in which he mandated that they relinquish possession of the Hummer and turn it over to Bisharat, or in the alternative, entered judgment against them in the amount of the value of the property not returned to Bisharat in addition to attorney's fees and costs to be determined at a future date. To date, no one has filed an appearance on behalf of either Hinawer or Esha and the vehicle has not been returned to Bisharat as ordered. Indeed, it is undisputed that Esha sold the vehicle to CarMax for $24,000.[10] After the case was transferred to this Court, Bisharat submitted prove-up materials regarding damages against Hinawer and Esha. Bisharat dropped the intentional

---

[10] The record does not reflect, however, when this sale took place or whether it took place before or after Judge Shadur's order.

infliction of emotional distress claim (Count XIV) against the Village of Niles defendants. They now move for summary judgment on all remaining counts against them.

## II.     Discussion

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit" under the applicable substantive law. *Ballance v. City of Springfield*, 424 F.3d 614, 616 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The purpose of summary judgment is to determine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248). "A court must grant a motion for summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Everett v. Cook Cnty.*, 655 F.3d 723, 726 (7th Cir. 2011) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005)).

The Court must construe all facts and draw all reasonable inferences in the light most favorable to Bisharat. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). Even so, Bisharat "must do more than simply show that there is some metaphysical doubt as to the material facts." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The Court's "favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'"

*Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)). "The mere existence of a scintilla of evidence in support of [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the nonmovant]." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). Here, Bisharat has failed to produce such evidence as to any of his claims against the Village of Niles defendants.

### A. Section 1983 Conspiracy Claims (Counts VII and VIII)

To establish a prima facie case of civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive the plaintiff of his constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement. *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988); *see also Garcia v. City of Chicago*, No. 09 C 5598, 2012 WL 601844, at *3 (N.D. Ill. Feb. 23, 2012); *Horan v. City of Chicago*, No. 09 C 0505, 2010 WL 2836729, at *7 (N.D. Ill. July 16, 2010). Bisharat fails to make a showing sufficient to establish the existence of the first element, an agreement among the defendants.

Bisharat does not argue or cite evidence suggesting that the agreement was express. Where "the agreement is not overt, 'the alleged acts must be sufficient to raise the inference of mutual understanding' (*i.e.*, the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (quoting *Kunik v. Racine County, Wis.*, 946 F.2d 1574, 1580 (7th Cir. 1991)). "Although a conspiracy certainly may be established by circumstantial evidence," the Seventh Circuit has "stressed that such evidence cannot be speculative." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). "[A] conspiracy claim cannot survive summary judgment if the allegations

are vague, conclusory and include no overt acts reasonably related to the promotion of the alleged conspiracy." *Amundsen*, 218 F.3d at 718 (internal quotation marks omitted).

Bisharat argues that several pieces of evidence could lead a rational fact-finder to find in his favor, however, he fails to make a showing sufficient to raise the inference of the requisite mutual understanding. He first points to Esha's deposition testimony that the Niles police knew him. In his deposition, Esha described going to the Niles Police Department the day *after* he made the 911 call on May 11, 2009, then stated, "So they know me, all of them. I bring the car back to them." Esha Dep. 84, Def.'s 56.1 Ex. 6, Dkt. 94-6. Ostensibly, Bisharat asks the Court to find that a reasonable jury could infer from this statement that Esha and the Village of Niles defendants were co-conspirators. But such an inference would be utterly speculative; simply knowing someone does not, of course, suggest engagement in a mutual endeavor. Indeed, the Seventh Circuit has found that even numerous phone calls between alleged conspirators does not, standing alone, support the existence of a conspiracy. *See Seniff*, 342 F.3d at 785 (citing *Goetzke v. Ferro Corp.*, 280 F.3d 766 (7th Cir. 2002)). What is more, the evidence fails to support any inference that Muscolino actually knew Esha. The spare, conclusory statement in Esha's deposition that the people at the Niles Police Department "all" know him based on one visit post-dating the 911 call supports a conspiracy claim even less, especially in light of Bisharat's failure to properly dispute the fact that Muscolino had neither seen nor met Esha before, nor had he been to the Baghdad Grocery before responding to the 911 call on May 11, 2009.

Bisharat also relies on deposition testimony that Muscolino had been told, before completing his initial police report regarding the Hummer, that Bisharat had been given a set of keys to the vehicle and that Muscolino had seen the signed Bill of Sale. In Bisharat's deposition,

he testified that on May 11, 2009, he said to Muscolino during their phone call, "I said I have the keys for it, I have the title, I have the bill of sale, and I have the payoff letter." Bisharat Dep. 44, Def.'s 56.1 Ex. 1, Dkt. 94-1. Muscolino also testified that Esha told him that Bisharat (the unspecified "someone" that Esha described as involved in the transaction regarding the vehicle) had been given keys to the vehicle. Muscolino Dep. 15, Def.'s 56.1 Ex. 2, Dkt. 94-2. For the proposition that Muscolino had the Bill of Sale, Bisharat relies on his own deposition, in which he summarized part of their phone call, "Then [Muscolino] told me that the bill of sale is not notarized, so it's not legal – what's the word? It's not – it needs to be notarized for it to be correct." Bisharat Dep. 44, Def.'s 56.1 Ex. 1, Dkt. 94-1.

Bisharat's theory is that despite this background knowledge, Muscolino wrongly entered the report as pertaining to a "stolen auto" and threatened to arrest Bisharat "to facilitate the return of the vehicle to his co-conspirator." Resp. 8–9, Dkt. 101. Again, this evidence is far too thin to support a finding for Bisharat. The acts described are decidedly *not* "unlikely to have been undertaken without an agreement." *Amundsen*, 218 F.3d at 718. Instead, the acts reflect a routine initial investigation by Muscolino into a 911 call regarding an allegedly stolen vehicle, the questioning of a person (Bisharat) who asserted a right to the vehicle despite not being the registered owner, an acknowledgement by the person who reported the vehicle stolen (Esha) that someone had been given a set of keys to the vehicle, and the filing of an initial report setting forth all of that information. In short, Muscolino responded to a report of a stolen vehicle and filed a report accurately reflecting the complaining witness's report that his car had been stolen. Those facts do not remotely establish the existence of a conspiracy in which the police deliberately helped one party to the dispute defraud the other, even if the officer was aware of

13

facts that suggested that there may have been a dispute about the ownership of the car. Muscolino did what police officers are required to do: make an initial report and refer it for further investigation. His warning that Bisharat could be arrested if he drove the vehicle was the act of a police officer encouraging the person in possession of a vehicle that was the subject of disputed ownership to bring it to a specific place to help facilitate a resolution. Again, this is typical of a police investigation, not something that would be unlikely to occur absent a conspiracy. It is insufficient to sustain a finding of conspiracy.

Even if Officer Muscolino should have classified the report differently than he did—a conclusion the Court does not endorse—the fact remains that the plaintiff has adduced no evidence whatsoever to support an inference that Muscolino deliberately misclassified the report in order to assist Esha and Hinawer. The record contains no evidence suggesting that Muscolino knew Esha or Hinawer except in the context of his response to the 911 call. The record similarly lacks any evidence to suggest that he had an improper motive toward Bisharat. Instead, the record shows two witnesses reporting a vehicle stolen. The responding officer took statements, which were ambiguous and confusing at best, wrote a report of this potential crime, and passed it on for review; other than one phone conversation, Muscolino took no action toward Bisharat or to assist Hinawer and Esha. Further investigation revealed a very confused situation without an easily discernible answer as to who owned the car, leading police to reclassify the matter as a civil dispute. Assigning improper motive, and conspiratorial agreement, to Muscolino's initial classification of the police report (an act that appears not to have had any impact on Bisharat's rights) is pure conjecture. The summary judgment record does not bear even a metaphysical doubt on this point.

Bisharat further points to the later reclassification and alteration of the police report and the defendant officers' having "stonewalled" him in response to his requests for a copy of the police report as suggesting a cover-up. Resp. 8–9, Dkt. 101. But the reclassification of the matter as civil, as Bisharat wanted, works against him here. Upon review, McEnerney determined that the matter was indeed a civil dispute and modified the report, as he sometimes does, to reflect that determination—an action that is utterly inconsistent with Bisharat's conspiracy allegation. Bisharat made inquiries while this process was underway, and was given answers to his various inquiries that reflected that the report was in progress and included instructions on how to obtain it. This is hardly "stonewalling."

Bisharat also argues that the defendants have not produced enough of the relevant police manuals during discovery to show what policies, if any, were in place. The defendants, citing *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006), argue that the content of police manuals is irrelevant to whether a constitutional violation has occurred. Def.'s 56.1 Resp. ¶¶ 27–31. Bisharat does not rely on his discovery argument to support that a constitutional violation occurred, however; he argues instead that it is probative of whether a cover-up occurred, and therefore of whether a conspiracy existed. But there is no basis to infer the existence of policies that would contravene the actions taken by the Niles defendants in this case: the evidence adduced shows nothing more than that an incident report was prepared in response to a call about a stolen vehicle that was registered to someone other than the person in possession of the vehicle; the report was later revised upon review by a superior officer to be a civil matter, as Bisharat wanted. The only other contact between Esha and the Village of Niles defendants came when Esha visited the police to give them Bisharat's name and contact information. These acts are not

"unlikely to have been undertaken without an agreement" and are insufficient to sustain a finding for Bisharat on his conspiracy claims. Summary judgment on Counts VII and VIII in the defendants' favor is therefore appropriate.

### B. Deprivation of Property Claims (Counts IX and X)

It is well-established that a plaintiff may only bring a § 1983 claim against those who are personally responsible for the alleged constitutional deprivation. *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (citing *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002)). It is undisputed that no one from the Village of Niles Police Department ever took, seized, or impounded the Hummer. Pl.'s 56.1 Resp. ¶ III.A.19. Instead, Bisharat argues that Muscolino and McEnerney's conduct directly "enabled" Esha to take the vehicle back from Bisharat. But this claim is no different than the conspiracy claim; both turn (and fall) on the claim that the Niles defendants agreed to assist Hinawer in Esha in defrauding Bisharat. There is simply no evidence to support such a claim. Bisharat expends a lot of effort arguing that the misclassified police report prevented him from reporting the vehicle stolen after Esha took the Hummer from Bisharat on May 14, 2009, but that is beside the point. Unless the defendants deliberately misclassified the report, they did not conspire with the other defendants and did not participate in their alleged wrongdoing within the meaning of 1983.

Bisharat also argues that Muscolino and McEnerney's actions "empowered" Esha to take the vehicle; he estimates that Esha would not have taken it had the matter not been initially reported as involving a stolen vehicle. Injury that is too remote a consequence of official action is not grounds to hold an official responsible in a §1983 suit. *See Martinez v. State of Cal.*, 444 U.S. 277, 285 (1980). Here, the causal chain between Muscolino's act of filing an initial incident

report as pertaining to a stolen vehicle and Esha's act of taking the car from Bisharat is too attenuated to charge fault to Muscolino. Bisharat offers no evidence that Muscolino or McEnerney directed Esha to take the car, or that they told him that he could take the car. Whether Esha felt "empowered" to do so is a product of his own thinking and decisionmaking process. The police report, whether considered in Muscolino's initial stolen-vehicle version or McEnerney's revised civil-dispute version, cannot be said to have caused Esha to take the Hummer, sell it, or otherwise to have caused Bisharat a constitutional deprivation of any kind. The defendants are therefore entitled to summary judgment on Counts IX and X.

The defendants also correctly argue that they are entitled to qualified immunity on these counts. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be "clearly established" for the purposes of qualified immunity, its contours must be "sufficiently clear" to enable an objectively reasonable official to understand that what he or she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In order to carry his burden of proving that the right he asserts was clearly established, Bisharat must either "(1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the 'contours of the right are so established as to make the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quoting *Boyd v. Owen*, 481 F.3d 520, 526–27 (7th Cir. 2007)). On this point, Bisharat offers *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56 (1992), in which the Supreme Court

held that a mobile home owner sufficiently stated a §1983 claim for a Fourth Amendment "seizure" by alleging that deputy sheriffs and the manager of mobile home park physically tore the owner's mobile home from its foundation and towed it away. *Soldal* stands only for the proposition that police cannot directly assist in the seizure of private property without complying with the Fourth Amendment. That unremarkable proposition (affirmed by the Supreme Court unanimously) helps Bisharat not a whit. This case is distinguishable in many ways, but most notably, there was no seizure here; to the contrary, Officer Muscolino did what the defendant deputy sheriffs in *Soldal* refused to do—take a complaint from the party alleging wrongdoing and investigate. Indeed, in this case, Bisharat plays the role not of Soldal, the party aggrieved by the unreasonable police action, but of the trailer park owner who engaged in self-help. Bisharat had the car towed away, just as the trailer park owner did Soldal's trailer. In essence, his beef is that the police did not side with him in the dispute about ownership of the car, but that is what got the police in trouble in *Soldal*: they assisted one of the parties rather than letting the complaining witness file a complaint. *Soldal* is relevant here, but only to show that Muscolino did precisely what he should have done. Nothing in *Soldal* would suggest to a police officer responding to a stolen vehicle report that he should not classify the report as one involving a stolen vehicle. The situation here is therefore too factually dissimilar for *Soldal* to have rendered it clear that these defendants' acts violated clearly established rights.[11] The defendants are

---

[11] Bisharat argues that it is impossible to know what departmental polices were violated by the defendants' actions because the defendants failed to produce sufficient documentation during discovery, but such policies would be irrelevant anyway to the analysis of the contours of a "clearly established statutory or constitutional" right. *See Thompson*, 472 F.3d at 454 (noting that §1983 does not protect against violations of departmental regulations and police practices).

accordingly entitled to qualified immunity and summary judgment in their favor on Counts IX and X.

### C. Failure to Investigate (Count XI)

Bisharat bases his Count XI claim for failure to investigate on the defendants' duty to respond to his complaint against Muscolino in writing. He seems to premise this claim on the theory that the police department is required to respond to citizen complaints in writing according to "its own internal rules for conduct." Pl.'s Resp. 13, Dkt. 101. He cites no such requirements in the police department's rules, though his failure to do so is irrelevant to the viability of his claim: it has long been recognized that § 1983 imposes liability only for violations of federal law, not state law or police department regulations or procedures. *See, e.g.*, *Thompson*, 472 F.3d at 454 ("[Section 1983] protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."); *Windle v. City of Marion, Ind.*, 321 F.3d 658, 662 (7th Cir. 2003); *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995). Bisharat cites no law establishing that he had a federal constitutional or statutory right to a written response, and this Court is aware of no authority that so holds. The defendants are therefore entitled to summary judgment on Count XI.

### D. State Law Claims (Counts XII and XIII)[12]

---

[12] Ordinarily, the Court would relinquish jurisdiction over any remaining state law claims under 28 U.S.C. § 1367(c)(3), as it has dismissed all federal claims short of trial. However, the Seventh Circuit has identified several exceptions to the presumption of such relinquishment of state claims, including where the record has rendered it obvious how those claims should be decided. *See Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Here, the record is such that the merits of these two claims is not a close call. Additionally, considerations of judicial efficiency counsel toward retention of jurisdiction. *See Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 731 (7th Cir. 2001). This case has been pending since 2010. Judgment has already been entered in Bisharat's favor on other state law

To prevail on a claim for tortious interference with an existing contract, a plaintiff must prove "(1) the existence of a valid and enforceable contract between plaintiff and another; (2) defendant's awareness of the contractual obligation; (3) defendant's intentional and unjustified inducement of a breach of contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages." *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 431, 735 N.E.2d 649, 661 (2000); *see also HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154, 545 N.E.2d 672, 676 (Ill. 1989). Here, Bisharat has failed to make a showing that would establish the third and fourth elements. As to the third element, Bisharat again relies on his "empowerment" theory to argue that Muscolino's "false report" characterizing the matter as pertaining to a stolen vehicle "induced and empowered" Esha to take the vehicle from Bisharat. But he offers no evidence that Muscolino intended this result, and therefore cannot successfully argue that he intentionally induced Esha to breach his obligations. Furthermore, Esha took the vehicle from Bisharat *after* the alleged breach of the sales agreement between Bisharat, Esha, and Hinawer took place, so Bisharat cannot reasonably argue that it was the Village of Niles defendants who induced a subsequent breach; the two, as Bisharat himself recounts the relevant events, occurred in the opposite order. Bisharat has not produced evidence that would establish at least these two required elements, therefore further analysis is unnecessary and the defendants are entitled to summary judgment on Count XIII.

---

claims against Hinawer and Esha, and proceedings will continue, albeit briefly, to enable the Court to rule on the amount of damages that Bisharat is owed on those claims. To fragment these state claims off from this case to begin anew in state court would not be an efficient use of resources, given the obvious lack of evidence to support the plaintiff's claims. The Court will therefore exercise its discretion to retain jurisdiction.

"Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994). "A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Id.* (citation omitted). "There is no such thing as accidental, inadvertent or negligent participation in a conspiracy." *Id.* "A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (quoting *Adcock*, 164 Ill. 2d at 64, 645 N.E.2d at 894).

Under Illinois law, "a conspiracy is not an independent tort"; where a plaintiff "fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Norweb PLC*, 316 Ill. App. 3d at 432, 735 N.E.2d at 662 (collecting cases). Bisharat points to Muscolino's initial submission of the incident report as evidence of his conspiratorial intent, but as previously discussed in relation to the federal conspiracy claims, he has not identified sufficient evidence from which an agreement may be inferred. Nor has he made a showing of the requisite tortious act; on this point, he argues merely that he means the intentional interference with contract claim to be the underlying cause of action for his claim of civil conspiracy. However, this claim fails on its merits, and there are no remaining viable state tort claims against the Village of Niles defendants. They are therefore entitled to summary judgment on Count XII, too.

### E. Claims Against the Village of Niles (Counts XV and XVI)

With no claims left for which the Village of Niles could be vicariously liable or responsible for indemnification, it too is entitled to summary judgment on Counts XV and XVI.

\*       \*       \*

For these reasons, the Village of Niles defendants' motion for summary judgment [92] is granted in its entirety and the case is terminated as to defendants Dean Strzelecki, Dennis McEnerney, Anthony Muscolino, and the Village of Niles.

Date: June 4, 2014

_____
John J. Tharp, Jr.
United States District Judge